IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 5, 2026 Session

## STATE OF TENNESSEE v. GABRIEL SETH BOX

**Appeal from the Circuit Court for Henderson County**
**No. 22-216-2        Donald H. Allen, Judge**

_____

### No. W2025-00274-CCA-R3-CD

_____

A Henderson County jury convicted the Defendant, Gabriel Seth Box, of first degree premeditated murder, theft of a firearm, and two counts of tampering with evidence. The trial court imposed an effective sentence of life plus six years. On appeal, the Defendant raises two issues: (1) whether the trial court erred in denying his motion to continue the trial date so that he could present an expert witness; and (2) whether the trial court erred in imposing consecutive sentencing. Upon our review, we conclude that the Defendant's motion to continue should have been granted, though the error was harmless in light of the expected testimony of the defense expert. We also conclude that the case should be remanded for reconsideration of consecutive sentencing under the factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). Accordingly, we respectfully affirm in part, reverse in part, and remand the case for reconsideration of the issues related to consecutive sentencing.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Affirmed in Part, Reversed in Part;**
**Cases Remanded**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Brennan M. Wingerter, Assistant Public Defender – Appellate Director, Tennessee District Public Defenders Conference (on appeal); Jeremy B. Epperson, District Public Defender; and Austin Bethany, Assistant District Public Defender (at trial), for the appellant, Gabriel Seth Box.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Shaun Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

### A. THE SHOOTING DEATH OF FELICITY INMAN

On November 19, 2021, the victim, Felicity Inman, was staying with the Defendant at his father's house in Henderson County, Tennessee. The victim was the Defendant's former girlfriend, and the couple had a daughter together.

That afternoon, the Defendant returned to the residence and found the victim in her car in the driveway. The two then drove together to the Defendant's mother's house, where the Defendant went inside and took his stepfather's 9mm handgun. The Defendant and the victim then drove to Dogwood Lake.

Sometime within the next hour and a half, the victim was shot and killed. The Defendant did not call 911. Instead, he moved the victim's body into the front passenger seat of her vehicle, covered her with blankets, and drove around for approximately two and a half hours. Cell phone location data showed that he traveled to several locations during this time, including a local airport and a quarry.

Shortly after leaving Dogwood Lake, the Defendant messaged a friend and asked him whether he could leave work. When the friend said he could not and asked why, the Defendant said only, "It was bad." The Defendant then asked whether the friend was his best friend and whether he would "do anything for him." He also told the friend not to tell anyone that they had spoken.

About an hour later, the Defendant sent a text message to the victim's phone, stating, "I love you. I hope you have fun tonight. Call me if you need anything. I promise I'll answer." He then drove to various places and made multiple telephone calls to his father before returning to his father's house. Upon arriving, the Defendant searched "what does homosidd [sic] mean" on the internet. The Defendant's father then called 911 and reported that the victim had died.

## B.    THE INVESTIGATION

When law enforcement arrived, they found the victim's body in the front passenger floorboard of the vehicle. Officers observed that the victim's shirt had been pulled up, her pants were unfastened, and the driver's side window had been completely shot out. Although the Defendant told officers that the victim had shot herself, the officers believed the circumstances were consistent with a possible homicide, and they called investigators to respond.

The Defendant told the officers that he did not know where the victim had obtained the gun and that he had disposed of it after the shooting. He said that he called his father after the shooting and drove home. He did not disclose that he had driven around for several hours, attempted to contact multiple people despite not contacting the police, or sent messages to a friend and to the victim's phone.

Law enforcement also separately conducted a recorded interview of the Defendant later that night. In that interview, the Defendant claimed he was seated in the passenger seat of the vehicle when the victim shot herself. When asked about the gun, he initially denied taking his stepfather's firearm but eventually admitted that he had taken it to give to the victim.

Investigators did not find a shell casing inside the vehicle or at Dogwood Lake. However, they later found a single 9mm Winchester shell casing in the crawlspace of the Defendant's father's home—the same type of ammunition the Defendant's stepfather kept with his handgun. DNA swabs from the Defendant's hands were also positive for gunshot residue, indicating that the Defendant either discharged a firearm or was nearby when a firearm was discharged.

## C.    TRIAL PROCEEDINGS

On October 4, 2022, a Henderson County grand jury charged the Defendant with four offenses arising from the events of November 19, 2021: (1) the first degree premeditated murder of the victim; (2) theft of the firearm; (3) tampering with evidence by moving the victim's body; and (4) tampering with evidence by concealing the firearm.

Prior to trial, the court approved funding for the Defendant to retain Dr. Eric Warren, an expert in firearms identification and crime scene reconstruction, to assist in his defense.

The trial court granted two of the Defendant's requests to continue the trial date to accommodate Dr. Warren's schedule but denied a third request in July 2024. After the Defendant sought interlocutory review, this court held that the defense was not required to disclose Dr. Warren's report and noted that the denial of a continuance would be reviewable on direct appeal. *State v. Box*, No. W2024-01296-CCA-R10-CD (Tenn. Crim. App. Aug. 27, 2024) (Tenn. R. App. P. 10 Order). The case then proceeded to trial without Dr. Warren's testimony on August 27, 2024.

At the trial, the State called various witnesses to establish the facts recited above, including members of law enforcement, agents with the Tennessee Bureau of Investigation, the medical examiner, and the victim's friends and family. In addition, the medical examiner, Dr. Thomas Deering, testified that the victim had been shot in the back of the head and that the bullet exited above her left eye. Because he did not observe soot or stippling around the entrance wound, Dr. Deering concluded that the shot was fired from more than two feet away. Based on these findings and the surrounding circumstances, the medical examiner classified the manner of death as homicide, explaining that he could not "come up with a reasonable way to make this self-inflicted." On cross-examination, Dr. Deering acknowledged that the methodology used to assess the firing distance was not exact.

For his part, the Defendant did not testify but called his mother and father as witnesses. No expert witness testified for the defense.

The jury convicted the Defendant on all four counts as charged. The trial court sentenced the Defendant to life imprisonment on the first degree murder conviction and imposed six-year sentences on each tampering conviction and a two-year sentence on the theft conviction. The court ordered the tampering and theft sentences to run concurrently with each other but consecutively to the life sentence, resulting in an effective sentence of life plus six years.

The Defendant filed a timely motion for a new trial, which the trial court denied by written order on February 26, 2025. The Defendant filed a premature notice of appeal, which became effective upon entry of the trial court's order. *See* Tenn. R. App. P. 4(d).

## ANALYSIS

The Defendant raises two issues on appeal. First, he argues that the trial court erred by denying his motion to continue the trial so that his firearms and crime scene

reconstruction expert witness could testify. Second, he asserts that the trial court erred by imposing partial consecutive sentencing without making the additional findings required for the dangerous-offender category under Tennessee Code Annotated section 40-35-115(b).

The State responds that the trial court acted within its discretion in denying a continuance, but even if there were error, it was harmless. Further, the State agrees that the trial court did not make the necessary findings for consecutive sentencing but maintains that this court should conduct a de novo review of the record and conclude that consecutive sentencing was appropriate in this case.

We address each issue in turn.

## A.    THE DEFENDANT'S MOTION TO CONTINUE

The Defendant first argues that the trial court abused its discretion in denying his third motion for a continuance. Specifically, he contends that the trial court improperly relied on his failure to produce a report from his expert in firearms and crime scene reconstruction, while refusing to accommodate the expert's scheduling constraints. He further argues that the denial was prejudicial because it prevented him from calling the expert to testify on matters he could not otherwise present at trial.

The State responds that the trial court acted within its discretion in denying the third motion to continue, given that two prior continuances had already been granted and further delay was unreasonable. The State further contends that any error was harmless because the Defendant was able to elicit the substance of the proposed expert testimony through cross-examination of the State's witnesses.

We conclude that the third motion to continue should have been granted. We further conclude, however, that the error was harmless beyond a reasonable doubt and does not entitle the Defendant to relief.

### 1.    Background

In June 2023, the Defendant filed an ex parte motion for funds and expert services, which outlined the relevance and materiality of Dr. Eric Warren's consultation and potential testimony in this case. The trial court granted that motion and approved the requested

funding. In November 2023, the Defendant filed a motion to continue the trial date set for the following month, citing the voluminous discovery in this case and other trial obligations. The State did not object, and the case was reset to June 2024.

The Defendant later filed a second motion to continue in April 2024 to reset the June trial date. The trial court held a hearing on April 16, and the Defendant informed the court that Dr. Warren was not available for the June 2024 trial date. Defense counsel further advised that Dr. Warren's "calendar is pretty full up until about September." The trial court requested that the Defendant file an affidavit from Dr. Warren addressing his availability and reset the matter for May 10, 2024. On May 10, the trial court granted the Defendant's motion to continue but reset the trial for the week of August 27, despite the Defendant's representation that Dr. Warren would be unavailable then.

On July 3, 2024, the Defendant filed a third motion to continue, citing Dr. Warren's unavailability. The trial court heard that motion on July 30. The Defendant informed the court that Dr. Warren was unavailable for the August trial dates but could appear one week later, on September 2. The State emphasized that Dr. Warren had not produced a report. Defense counsel explained that no report was required because Dr. Warren was unavailable for the August trial date. Counsel further noted that a report would be furnished if the case were continued to a date when Dr. Warren was available.

Relying primarily on the Defendant's failure to furnish an expert report, the trial court denied the motion. After this court later granted limited review pursuant to Tennessee Rule of Appellate Procedure 10, however, the trial court modified its discovery order to reflect that no report would be required if Dr. Warren did not testify. *State v. Box*, No. W2024-01296-CCA-R10-CD (Tenn. Crim. App. Aug. 27, 2024) (Tenn. R. App. P. 10 Order).

At the motion for a new trial hearing, the Defendant submitted an affidavit from Dr. Warren detailing what his testimony would have covered. The Defendant did not call Dr. Warren as a witness at that hearing.

## 2. Standard of Appellate Review

The grant or denial of a motion to continue rests within the trial court's sound discretion. *State v. Rimmer*, 250 S.W.3d 12, 40 (Tenn. 2008); *State v. Scott*, 33 S.W.3d 746, 750 (Tenn. 2000) (reviewing denial of expert assistance for abuse of discretion before proceeding to harmless-error analysis). A trial court abuses its discretion when it applies

an incorrect legal standard or reaches a conclusion against logic and reasoning that causes an injustice to the complaining party. *Id.*

Finding error, however, does not end the inquiry. This court will reverse only if the error in failing to grant a continuance prejudiced the defendant. *Rimmer*, 250 S.W.3d at 40. The question of what effect the error had is analytically distinct from the question of whether error occurred, and it is governed by a separate harmless-error standard. We address each question in turn.

### 3. Relevant Law

In considering whether to continue proceedings, "[a] trial court should balance the potential harm to the defendant caused by a delay against the potential harm to the State caused by no delay[.]" *Wyatt v. State*, No. M2019-00250-CCA-R3-PC, 2020 WL 1674014, at *7 (Tenn. Crim. App. Apr. 6, 2020) (citation omitted), *no perm. app. filed*; *see also State v. Mendenhall*, No. M2018-02089-CCA-R3-CD, 2020 WL 2494479, at *32 (Tenn. Crim. App. May 14, 2020), *perm. app. denied* (Tenn. Nov. 12, 2020). These competing harms should be weighed "within the context of the court's duty to administer the criminal justice system within its circuit, including the control of its docket." *Wyatt*, 2020 WL 1674014, at *7.

To that end, a trial court may weigh the following factors, among others, when considering whether to grant a continuance to secure admissible and material evidence:

- the length of the requested delay and the probability of locating witnesses or securing the evidence within the requested time, *State v. Russell*, No. M2017-01152-CCA-R3-CD, 2018 WL 3700922, at *11 (Tenn. Crim. App. Aug. 3, 2018), *perm. app. denied* (Tenn. Nov. 14, 2018);

- the length of time that the case has been pending, *State v. Perry*, No. M2019-01311-CCA-R3-CD, 2021 WL 1111368, at *16 (Tenn. Crim. App. Mar. 23, 2021), *perm. app. denied* (Tenn. July 12, 2021);

- whether other continuances have been requested and granted, *Mendenhall*, 2020 WL 2494479, at *32;

- the convenience or inconvenience to the litigants, witnesses, counsel, and the court, *id.*;

- whether the continuance "would have made relevant witnesses unavailable or added something to the defense," *State v. Daniels*, 656 S.W.3d 378, 386 (Tenn. Crim. App. 2022); and

- whether "the testimony or evidence is not merely cumulative to other evidence" and whether "diligence was exercised to obtain the presence of the witness or evidence," *State v. Bennett*, 798 S.W.2d 783, 787-88 (Tenn. Crim. App. 1990).

*See, e.g.*, *State v. Hurn*, No. E2022-01192-CCA-R3-CD, 2023 WL 7001621, at *5 (Tenn. Crim. App. Oct. 24, 2023), *perm. app. denied* (Tenn. Apr. 11, 2024). When the complaint is the unavailability of a witness, the relevant questions are whether the testimony is relevant and material, whether the defendant exercised diligence in securing the witness's attendance, and whether the proposed testimony is available through other means. *See State v. Cox*, No. E2020-01388-CCA-R3-CD, 2022 WL 325596, at *8-10 (Tenn. Crim. App. Feb. 3, 2022), *perm. app. denied* (Tenn. June 8, 2022).

### 4. The Trial Court's Denial of a Continuance

Applying these principles, we begin by acknowledging that a trial court possesses substantial authority to control its own docket, including the authority to deny a continuance. *See Wyatt*, 2020 WL 1674014, at *7 (noting that continuance decisions are weighed "within the context of the court's duty to administer the criminal justice system within its circuit, including the control of its docket"). We do not substitute our judgment for the trial court's judgment on docket-management questions generally. In this context, however, our review necessarily turns on what the appellate record reflects.

As an initial matter, this case had been pending for almost two years, and two prior continuances had been granted at the Defendant's request. This circumstance favored denying a third continuance. The appellate record, however, does not show that several other relevant circumstances were addressed in connection with the Defendant's motion.

For example, the appellate record does not show that the trial court's denial took into account Dr. Warren's status as a material defense witness. When the trial court

approved funding for Dr. Warren, it found that his services were "necessary for the protection of the Defendant's constitutional rights" and that "there is a particularized need for the services." *See Scott*, 33 S.W.3d at 753 (permitting indigent funding for an expert when the defendant "will be deprived of a fair trial without the expert assistance" and "there is a reasonable likelihood that [the assistance] will materially assist" the defendant in preparing his case). At the August hearing, however, the trial court stated that "there's been nothing submitted to say that he would even testify to anything that would be material to the case." The appellate record does not reflect what, if anything, had changed in the intervening fourteen months to bear on that earlier determination.

The appellate record likewise does not show a basis for declining to credit Dr. Warren's stated reasons for his unavailability. His affidavit explained that he was contractually obligated to provide firearms-examiner training for the Houston Forensic Science Center during the week of August 27. The case was nonetheless reset to that week, notwithstanding this representation, without further explanation in the record.

Against that backdrop, the length of the requested delay is a relevant factor. The Defendant's motion, filed on July 3, requested a continuance of the August 27 trial date. Attached to that motion was Dr. Warren's affidavit, which stated he was available one week later, on September 2. At the July 30 hearing, the Defendant reiterated that Dr. Warren was available just one week after the current trial date and specifically requested that the trial be reset to that week. This was not a request to delay trial by months. Instead, it was a request for a seven-day adjustment, and the record does not reflect that this distinction was addressed.

The impact on the court's docket is likewise part of the analysis. The appellate record, however, does not show that the court was unavailable the next week or that the State and its witnesses could not appear. Nor does the record show that the proposed expert evidence was available through other means. *See Cox*, 2022 WL 325596, at *8-10.

Finally, we note that the denial rested significantly on Dr. Warren's failure to produce an expert report for the State. That basis cannot independently sustain the ruling, however, because this court held at the time that the trial court's report-disclosure requirement exceeded what Rule 16(b)(1)(B) permitted. *State v. Box*, No. W2024-01296-CCA-R10-CD (Tenn. Crim. App. Aug. 27, 2024) (Tenn. R. App. P. 10 Order).

We recognize the possibility that the trial court was aware of circumstances not fully apparent in this record in denying the Defendant's request for a continuance. On the record

before us, however, we respectfully conclude that the Defendant's motion should have been granted.

### 5.     The Effect of the Error

Having concluded that the Defendant's motion to continue should have been granted, we turn to the effect of that error. The parties dispute which harmless-error standard governs. The Defendant contends that the denial of the continuance implicates his constitutional right to present a defense and that the State must, therefore, prove the error harmless beyond a reasonable doubt. The State responds that the Defendant bears the burden of demonstrating that the denial deprived him of a fair trial or that a different result reasonably could have followed.

We need not resolve which standard applies because the error was harmless under either standard.[1] Even assuming, without deciding, that the constitutional harmless-error standard applies and the burden falls on the State, we conclude that the State has demonstrated beyond a reasonable doubt that Dr. Warren's absence did not contribute to the verdict. The record developed at the motion for a new trial, the scope of Dr. Warren's proposed testimony, and the substantial independent evidence of the Defendant's guilt each support that conclusion.

#### a.     Nature of the Record on Appeal

Assuming the constitutional harmless-error standard applies, the State must demonstrate beyond a reasonable doubt that Dr. Warren's absence did not contribute to the verdict. *Scott*, 33 S.W.3d at 755. We assess that question on the appellate record as it

---

[1]     The Defendant urges application of the constitutional harmless-error standard on the ground that the denial of a continuance depriving him of expert testimony is functionally equivalent to the denial of expert funding addressed in *State v. Scott*, 33 S.W.3d 746, 755 (Tenn. 2000). We do not foreclose that argument. The supreme court in *Scott* grounded constitutional harmless-error review in the due process principle that a failure to provide an indigent defendant with needed expert assistance amounts to a denial of due process of law. *Id.* Whether that principle extends to a continuance denial that produces the same practical effect—the absence of court-funded expert testimony—is a question our supreme court has not resolved, and we need not resolve it here because the result is the same under either standard. *See State v. Rimmer*, 250 S.W.3d 12, 40 (Tenn. 2008); *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995).

exists—including the record developed at the hearing on the motion for a new trial. *See* Tenn. R. Crim. P. 33(c); Tenn. R. App. P. 3(e).

The record before us has a significant limitation. At the motion for a new trial hearing on January 17, 2025, the Defendant submitted an affidavit from Dr. Warren. Defense counsel offered it as a summary of the testimony Dr. Warren "would have" offered at trial, and the trial court admitted it as Exhibit 1 without objection from the State. Dr. Warren did not appear at the hearing and was not subject to examination by either party or inquiry by the trial court. As such, the record contains no examination of the extent of his review of the specific evidence in this case. It reveals no probing of the methodology underlying his opinions and enables no assessment of how his criticisms of the State's experts would have held up under cross-examination.

An affidavit reflects what the affiant chooses to say, framed as he or she chooses to say it. Dr. Warren's affidavit takes issue with the medical examiner's homicide conclusion and the adequacy of the TBI's investigation. But it does not identify the specific evidence he reviewed or set out the methodology underlying those criticisms. It also does not explain what a reconstruction of the shooting event would have shown or why it would have been feasible given the condition of the scene. In other words, the record does not establish that Dr. Warren's opinions were reliable, that they would have been admissible, or that a jury would likely have credited them. *See* Tenn. R. Evid. 702, 703.

As such, we assess the State's burden against the record as it stands—the affidavit, taken at face value and given every reasonable benefit to the Defendant—rather than against a reconstruction of testimony that was never subjected to adversarial testing. On that record, the question is whether the State has demonstrated beyond a reasonable doubt that Dr. Warren's testimony would not have affected the verdict. For the reasons that follow, we conclude that the State has met this burden.

### b.      Scope of Dr. Warren's Proposed Testimony

The record does not show that Dr. Warren's proposed testimony meaningfully went beyond what the jury had already heard. Dr. Warren's affidavit identifies three areas of proposed testimony: the absence of forensic ballistic evidence establishing that the Defendant shot the victim; the failure to reconstruct the shattered window or the shooting event; and a challenge to the medical examiner's homicide conclusion. The Defendant was able to place the essential substance of each area before the jury through cross-examination of the State's witnesses.

- 11 -

As to the reconstruction and trajectory analysis, defense counsel elicited on cross-examination that the TBI did not request a crime scene reconstruction and that no forensic trajectory analysis was performed. The TBI agent explained that reconstruction was not feasible, as the driver's side glass was gone, the victim's body had been moved, and the scene was no longer in its original condition. The firearms examiner also acknowledged that there was insufficient data to make a trajectory determination given the absence of a bullet hole in the car. Dr. Warren's affidavit does not address these explanations or identify any methodology that would have supported a reconstruction despite these obstacles. The affidavit's principal point on this subject—that no reconstruction was attempted—was a fact the jury had already heard.

As to the medical examiner's homicide conclusion, Dr. Warren's affidavit asserts that soot around the entry wound can be filtered by hair, making the absence of soot "neutral evidence" rather than proof of a distant shot. He further suggests that the medical examiner changed his manner-of-death determination only because he consulted with law enforcement. Yet, defense counsel cross-examined the medical examiner on both points at trial. Counsel specifically asked whether hair could act as an intervening object affecting soot and stippling, and the medical examiner confirmed that it could. Counsel also elicited that the methodology used to assess the range was not exact and relied on rules of thumb rather than precise measurements.

The medical examiner explained that he did not change his opinion of the manner of death; he was not initially prepared to render a final determination until he had completed all required testing and assembled the relevant data points. Dr. Warren's affidavit does not address this testimony, and the record provides no basis to conclude that Dr. Warren's proposed testimony would have materially altered the jury's assessment of the medical examiner's conclusions.

The jury, therefore, heard the Defendant's essential themes: the State did not reconstruct the shooting, did not recover the gun or bullet, and did not perform a forensic trajectory analysis; the absence of soot was not necessarily proof of a distant shot; and the medical examiner's determination of the manner of death was a judgment call rather than a scientific certainty. Dr. Warren's proposed testimony, as reflected in his affidavit, would have reinforced those themes. The record does not show, however, that it would have introduced materially new evidence that the jury had not already considered.

### c.     Substantial Evidence of the Defendant's Guilt

We also look to the other evidence of the Defendant's guilt offered at trial. Beyond the forensic disputes that Dr. Warren's affidavit proposed to address, the remaining proof fell into two independent categories—physical evidence directly linking the Defendant to the weapon, and his conduct in the hours that followed—neither of which his proposed testimony would have reached.

First, the physical evidence tied the Defendant directly to the shooting. He took his stepfather's 9mm handgun from his mother's home earlier that day. The gun was never recovered. Several days after the shooting, investigators found a Winchester 9mm shell casing inside the crawlspace of the Defendant's father's home—matching the same type of ammunition the Defendant's stepfather kept with his missing handgun. Tests on swabs taken from the Defendant's hands confirmed the presence of gunshot residue.

Second, the Defendant's conduct in the hours following the shooting was equally probative. After the victim was shot, he did not call 911. He moved her body into the front passenger floorboard, covered her with blankets, and drove around for approximately two and a half hours. Cell phone location data placed him at a quarry and a local airport— locations he did not disclose to law enforcement. During that time, he messaged his friend, told him, "it was bad," asked whether the friend would "do anything for him," and instructed him not to tell anyone they had spoken. About an hour later, while still driving with the victim's body in the vehicle, he sent a text message to the victim's own phone: "I love you. I hope you have fun tonight. Call me if you need anything. I promise I'll answer."

Immediately upon returning to his father's house, before any call to 911, he searched "what does homosidd [sic] mean" on the internet. It was the Defendant's father—not the Defendant—who called 911. When law enforcement arrived, the Defendant told officers that the victim had shot herself and that he had disposed of the gun, but he did not disclose that he had driven for over two hours, traveled to remote locations, or sent messages to his friend and to the victim's phone. In a recorded interview later that night, he initially denied taking his stepfather's firearm before eventually admitting that he had taken it.

None of this evidence fell within the scope of Dr. Warren's proposed testimony, which addressed the forensic analysis of the shooting itself—the trajectory, the reconstruction, and the medical examiner's range determination. The Defendant's possession of the murder weapon, his conduct in the hours following the shooting, his

calculated communications, and his false statements to law enforcement were matters that no expert in firearms or crime scene reconstruction could have addressed. The record does not show that Dr. Warren's testimony would have meaningfully altered the jury's assessment of this proof, if at all.

We conclude that the denial of the Defendant's motion to continue was harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this ground.

## B.    CONSECUTIVE SENTENCING

The Defendant also argues that the trial court erred by imposing partial consecutive sentences. Specifically, the Defendant asserts that the trial court erred when it found the Defendant a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4) but did not consider the additional factors required by *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), when making this determination. We agree and remand the issue of consecutive sentencing for the trial court's reconsideration.

### 1.    Background

The trial court held a sentencing hearing on October 21, 2024. The State argued that the Defendant was a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4) and that his actions showed little to no regard for human life. The trial court agreed and imposed consecutive sentences, ordering the six-year sentences for theft and tampering with evidence to run consecutively to the life sentence for first degree murder. The court found that the Defendant was a dangerous offender based on "the facts and circumstances and based upon the proof presented," but made no additional findings pursuant to *Wilkerson*.

### 2.    Standard of Appellate Review

When a defendant challenges the imposition of consecutive sentences, this court reviews that decision for an abuse of discretion accompanied by a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). This court defers to "the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861.

### 3. Analysis

The process of imposing discretionary consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b) involves two steps. *See State v. Gardner*, 716 S.W.3d 388, 427 (Tenn. Crim. App. 2024). First, the trial court must find by a preponderance of the evidence that "the defendant qualifies for consecutive sentencing under one of the classifications set forth in section 40-35-115(b)." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022) (footnote omitted). Second, the trial court must "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *Id.*

In this case, the trial court found that the Defendant was a dangerous offender and qualified for consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(4). Our supreme court has held that "before imposing consecutive sentences based upon the dangerous offender classification, trial courts must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *See Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938). These conclusions also must be supported by "particular facts" in the record. *Gardner*, 716 S.W.3d at 427.

The State agrees that the appropriate findings were not made to impose consecutive sentences under *Wilkerson*. As such, we cannot "presume that the consecutive sentences are reasonable," nor can we "defer to the trial court's exercise of its discretionary authority." *Pollard*, 432 S.W.3d at 863-64. Because the considerations required under *Wilkerson* involve "a fact-intensive inquiry . . . the better course is to remand to the trial court for consideration of the *Wilkerson* requirements in determining the propriety of consecutive sentencing." *Id.*; *Gardner*, 716 S.W.3d at 427.

Accordingly, we respectfully vacate the order imposing consecutive sentences and remand for the trial court to consider the sentencing factors outlined in *Wilkerson*. We note that the trial court's reasoning need not be "particularly lengthy or detailed," but it "simply must set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." *Perry*, 656 S.W.3d at 126 (citation and internal quotation marks omitted). We express no opinion as to whether consecutive sentences are appropriate or should be imposed.

## CONCLUSION

In summary, we hold that the Defendant's motion to continue the trial should have been granted, but that the error did not affect the outcome of the trial and was, therefore, harmless.  However, we respectfully reverse the Defendant's consecutive sentences and remand for the trial court to consider the factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995).  In all other respects, we affirm the judgments of the trial court.

s/ **Tom Greenholtz**
TOM GREENHOLTZ, JUDGE